IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNILOC USA, INC., UNILOC LUXEMBOURG, S.A., | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 6:15-CV-01001-RWS-KNM |
| v. | § § | |
| ACRONIS, INC., CHIEF ARCHITECT, INC., | § § § | (LEAD CASE) |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion construes the disputed claim terms in the United States Patent No. 7,024,696 ("the '696 Patent"). On January 26, 2017, the parties presented arguments on the disputed claim terms at the *Markman* hearing. Doc. No. 154. The Court resolves the claim term disputes as stated and for the reasons discussed below.

### BACKGROUND

On November 20, 2015, Plaintiffs Uniloc Luxembourg S.A. and Uniloc USA, Inc. (collectively "Uniloc") filed the lead action captioned above against Defendant Acronis, Inc. ("Acronis") and its action (6:15-cv-1003) against Chief Architect, Inc. ("Chief Architect"), the other remaining Defendant in the consolidated case, (collectively "Defendants"). Uniloc alleges that Defendants infringe the '696 Patent, entitled "Method and System for Prevention of Piracy of a Given Software Application Via a Communications Network." The '696 Patent issued on April 4, 2006, from an application filed on June 14, 2000.

1

# OVERVIEW OF THE '696 PATENT

The '696 Patent generally relates to techniques for preventing the piracy of software applications. The Abstract provides:

> A method and system for prevention of piracy of a given software application via a communications network, such as the Internet. A given software application, installed on a user system, will not function until it is activated by a remote service provider. This will require the user to provide the remote service provider with user data, such as the user's personal identity information and the unique software identification code relating to the specific software. User data will then be compared to archived data in order to determine if the user is a pirator of the software. If not a pirator, the remote service provider may transmit undisclosed service data, such as a software activation code, to the user system. Once activated, the software will become fully operational and allow the user complete access to its functions. In this manner, piracy of a given software application can be prevented.

'696 Patent Abstract.

The disclosed techniques include preventing a software application from functioning until the software is activated by a remote service provider. *Id.* The software application has a unique identification associated with it. *Id.* Activation of the software application requires the user to provide user data. *Id.* User data is compared to archived data to determine if the user is pirating the software. *Id.* If the user is not pirating the software, the remote service provider transmits service data, for example, a software activation code, to the user computer system. *Id.* Once activated, the software will become operational and allows the user access to its functions. *Id.* Independent claim 15 includes a limitation related to the provision of service data when the number of times an attempt has been made to obtain the service data for the software application (assigned a unique identification code) is fewer than a predetermined threshold. Dependent claim 22 includes a limitation related to the user being able to download the service data into the user's computer.

Claim 15 states:

> 15. A system for preventing piracy of a given software application, said software application having a unique identification code associated therewith, and said software application requiring service data to activate at least part of the functionality of said software application, said system comprising:
> - a user computer system on which a user desires to operate the software application, said user system being connected to a communications network to transmit user data and to receive said service data, said user data being derived at least in part from said unique identification code;
> - a remote service computer system connected to said communications network to receive user data transmitted over the communications network from the user computer system said remote service computer system transmitting said service data to said user computer system when the number of times an attempt has been made to obtain said service data in order to activate at least part of the functionality of said software application assigned to such unique identification code is fewer than a predetermined threshold.

Dependent claim 22 adds:

> 22. The system as in claim 15 wherein said remote service computer system makes said service data available to said user from said remote service system, said user being able to download said service data into said user computer system.

## LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as

understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example,

"[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted); *Teva v. Sandoz*, 135 S.Ct. 831, 841 (2015) (In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period."). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Phillips*, 415 F.3d at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* When the court makes subsidiary factual findings about the extrinsic evidence in consideration of the "evidentiary underpinnings" of claim construction, those findings are reviewed for clear error on appeal. *Teva*, 135 S.Ct. at 841.

# DISCUSSION

## I. Agreed Terms

The parties submitted the following terms in the '696 Patent for which they agreed on constructions:

| Term | Agreed Construction |
| --- | --- |
| "unique identification code" | "a program code sequence comprised of alphanumeric characters, that would serve to identify each individual software application" |
| "software application having unique identification code associated therewith" | Plain meaning |
| "said software application assigned to such unique identification code" | Plain meaning |
| "assign" | Plain meaning |
| "communications network" | Plain meaning |
| "service data" | "any data that the remote service system may legitimately transmit to the user system during the online activation process for the software" |
| "activation code sequence" | "a program code sequence that serves to activate each individual software application, which, absent the activation code, would be either partially or completely dysfunctional" |
| "derived" | Plain meaning |
| "user data" | "any information originating from and/or available to the user of the software" |
| "user data being derived at least in part from said unique identification code." | Plain meaning |
| "a user computer system on which a user desires to operate the software application" | Plain meaning |
| "consistent with user data previously archived by said remote service computer system relative to the same unique identification code" | Plain meaning |

| | |
|---|---|
| "When the number of times an attempt has been made to obtain said service data in order to activate at least part of the functionality of said software application assigned to such unique identification code is fewer than a predetermined threshold" | Plain meaning |

The Court adopts these constructions.

## II. Disputed Terms

### A. "predetermined"/ "predetermined threshold" (claim 15)

| UNILOC'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| "a numerical based limit"  A numerical based limit with a temporal element is included within the meaning of this term, but a temporal element is not required. | "fixed" / "a fixed numerical limit" |

At the *Markman* hearing, both parties agreed that "predetermined threshold" refers to a numerical limit, which is based on the Court's construction of the term in an earlier case. *See Uniloc Luxembourg S.A., et al. v. Corel, Inc. et al.*, No. 6:12-cv-968, Doc. No. 115 at 20-21 (E.D. Tex. Dec. 15, 2014)) ("*Corel* Order") (construing this term to mean "a numerical based limit" and adding that "a temporal element is included within the meaning of this term, but a temporal element is not required."). The parties' proposed constructions mirror the language used in the *Corel* Order. The remaining dispute turns on whether the numerical limit is an adjustable number, or a fixed number. Uniloc contends that Defendants' proposed construction conflicts with the *Corel* Order because the numerical limit is not necessarily "fixed," but could be reset after a period time. Doc. No. 141 at 7.

Defendants respond that the *Corel* Order substantively addressed only the meaning of "threshold." Doc. No. 146 at 15-16. Defendants argue that the focus of the dispute in this case is

on the meaning of "predetermined" and whether a "numerical based limit" can subsequently be adjusted if, for example, a user purchases additional software licenses. *Id.* Defendants argue that in the *Corel* Order, the discussion of "temporal element" was not whether the numerical limit is fixed or dynamically adjustable, but instead whether "a predetermined number limit" imposed a "maximum number." *Id.* at 16. Defendants contend that the temporal element discussion in the *Corel* Order did not address the essence of the dispute here, which is whether the predetermined limit can change. *Id.* at 18. Defendants explain that this phrase is not found anywhere in the specification and rely solely on extrinsic evidence to show that the common usage and understanding of the term "predetermined" is "fixed." *Id.* at 18-19. Thus, the dispute now before this Court is different from the dispute addressed in *Corel*. Specifically, the parties now seek guidance as to the meaning of the term "predetermined."

As the Defendants correctly state, the phrase "predetermined threshold" appears only in the language of the claims; it does not occur anywhere in the specification. The relevant language in claim 15 explains that the remote service computer system transmits the service data to the user computer system only when the number of attempts to obtain service data for activating the software is less than a *predetermined threshold*, reciting in relevant part:

> remote service computer system transmitting said service data to said user computer system *when the number of times* an attempt has been made to obtain said service data in order to activate at least part of the functionality of said software application assigned to such unique identification code *is fewer than a predetermined threshold*.

'696 Patent, 10:53-59 (emphasis added); *see also* 11:64-67 (claim 24) ("selectively transmitting service data to the user's computer when the number of times an attempt has been made to obtain said service data is fewer than a *predetermined threshold*") (emphasis added). There is no intrinsic evidence to support Defendants' argument one way or another that the numerical limit is fixed. As

the parties conceded at the *Markman* Hearing, the patent is silent on whether: (1) the numerical limit can never be changed (as Defendants contend); or (2) the numerical limit can be changed in advance, for example, from 3 times a month in one month to 5 times a month in another month (as Plaintiffs contend).

To support their construction, Defendants solely rely on the dictionary definitions of predetermined to mean "fixed." *See* Doc. No. 146 at 18-19. But that only provides part of the definition. Based on the two dictionaries Defendants cite, the full definition of predetermine is: (1) "decide or fix … in advance; prearrange"; and (2) "to determine, decide, or establish in advance." *Id.* at 18-19. These definitions emphasize the meaning of the term relating to being determined in advance, not fixed or never subject to change. Furthermore, Defendants have cited to a number of decisions from this Court and the Federal Circuit regarding construction of the term predetermined. *Id.* at 19-20. When viewed as a whole, those cases similarly emphasize that predetermined means determined in advance. *Id.* Thus, the intrinsic and extrinsic evidence does not support Defendants' construction of predetermined to mean "fixed."

Predetermined means determined in advance. Accordingly, the Court construes **"predetermined threshold"** to mean **"a numerical based limit that is determined in advance."**

### B. "attempt" (claim 15)

| UNILOC'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Plain meaning | Plain meaning, which is "requests to activate the software that include unsuccessful requests" |

The parties dispute whether this term must include unsuccessful attempts or could exclude unsuccessful attempts and just include successful attempts to activate a software application. Uniloc argues that the specification does not define attempt "in a unique or limited manner." Doc.

No. 141 at 10 (citing '696 Patent at 4:40-43; 4:56-64; 4:65-5:1). In Uniloc's view, the number of attempts may be merely the number of successful attempts, unsuccessful attempts, or both. Doc. No. 148 at 3. Therefore, Uniloc contends that the meaning of attempt is straightforward and needs no construction. Doc. No. 141 at 10-11.

Defendants argue that Uniloc is trying to read "attempt" to mean either "activation" or "successful attempt," as evidenced by Uniloc's infringement contentions. Doc. No. 146 at 12. Defendants contend that Uniloc's construction would allow Uniloc to re-write the claim language and interchangeably use "attempt" with either a successful attempt or activation. *Id*. Defendants assert that the '696 Patent specification shows that there is a difference between an attempt to activate and an activation. *Id*.

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. Claim 15 states in relevant part:

> a remote service computer system connected to said communications network to receive user data transmitted over the communications network from the user computer system said remote service computer system transmitting said service data to said user computer system *when the number of times an attempt has been made to obtain said service data* in order to activate at least part of the functionality of said software application assigned to such unique identification code is fewer than a predetermined threshold.

'696 Patent at 10:50-59 (emphasis added). As claimed, the limitation tracks the number of "attempts" to obtain service data for activating the software application and whether that number exceeds a certain predetermined threshold. Claim 15 does not state what is tracked is the number of activations or installations of the software exceeds a predetermined threshold.

The specification also references attempts as attempts to activate, not actual activations or installations of the software application. *See e.g., id.* at 4:40-44 ("archived data may also consist of information indicating the *amount of user online activation attempts* recorded for each identified

software") (emphasis added); 4:58-64 ("if the archived data indicates that there has been repeated and *numerous attempts to activate the same software*") (emphasis added); 4:65-5:1 ("Multiple *online activation attempts of the same software 5, regardless if such attempts are by distinct or the same users* would naturally indicate that the software **5** was pirated and distributed to a multitude of different users.") (emphasis added). Thus, the specification indicates that only attempts are tracked, not activations. Though those two parameters may at times be the same, they are not necessarily so. To the extent Uniloc's proposal refers to the number of "attempts" to only mean the number of successful attempts (activations), Uniloc is deviating from the specific claim language. The surrounding claim language explicitly refers to "the number of times an attempt has been made to obtain service data." *Id.* at 10:55-56 (Claim 15). It is referring to the step in the process prior to activation that tracks the number of attempts to get the service data, independent of whether the attempt is successful or not. Therefore, the plain meaning of this phrase, which is evident from the language of the claim and the specification, includes all attempts (both successful and unsuccessful attempts) to obtain the service data. Accordingly, the Court construes **"attempt"** to have its **plain meaning**.

C. **"requiring" / "said software application requiring service data to activate at least part of the functionality of said software application" (claim 15)**

| UNILOC'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Plain meaning | Plain meaning which is "said software application, absent service data, would not be fully operational" |

The crux of the parties' dispute is whether the service data is needed to make the software application fully functional or whether it could simply activate part of the software's functionality. Uniloc argues that this term should be given its plain meaning. Doc. No. 141 at 14. Uniloc contends

that construction of this term is a "fruitless exercise" because the specification does not use "requiring" in a "unique or limited manner." *Id.* at 12-14 (citing numerous uses of "requiring" in the specification). Uniloc also points to a prosecution history amendment and argues that, at best, the prosecution history indicates that "must" is a synonym for require. *Id.* at 14. As the Defendants correctly state, however, many of Uniloc's citations are irrelevant because they either address "requiring" in an unrelated context or consider the term "requiring" in isolation, which is not helpful in resolving the parties' dispute. Doc. No. 146 at 11.

Defendants, on the other hand, argue that the "specification makes clear that absent service data, the software application would not be fully operational." *Id.* at 9 (citing '696 Patent at 5:12-14; 7:63-65). Defendants contend that Uniloc's construction ignores this context in the specification and would allow Uniloc to capture products that include trial periods, e.g., products that allow users to have access to the "full version" of the software for a limited time without requiring an activation code, which in Defendants' view is contrary to plain meaning. *Id.* at 10. According to Defendants, the '696 Patent never contemplated allowing users to have access to the "full version" of the software without use of the claimed system of unique identification code, user data, and service data. *Id.* (citing '696 Patent at 8:11-14; 3:10-15). Defendants contend that plain meaning without more, is ambiguous as to whether the "full version" of the software is accessible by the user without the activating service data.

Defendants' essentially argue that without the service data, the software application will be missing some of its functionality. The converse of this argument, i.e., with the service data, the software will have all of its functionality—while required by Defendants' construction—is not required by the explicit language of the claim. Claim 15 states in relevant part: "said software application requiring service data to *activate at least part of the functionality* of said software

12

application." '696 Patent at 10:40-42 (emphasis added). Thus, it is evident from the plain language of claim 15 that: (1) the service data is required to activate the software application; and (2) this activation includes at least a part of software's functionality. In other words, contrary to Defendants' construction, claim 15 does not state that the service data is required to activate all of the software's functionality; service data may be required to activate just part of the software's functionality.

Accordingly, the Court construes **"said software application requiring service data to activate at least part of the functionality of said software application"** to have its **plain meaning**.

### D. "makes said service data available" (claim 22)

| UNILOC'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|
| Plain meaning | "makes said service data available by any means that include transmitting the service data to the user" |

The parties' dispute turns on the extent to which claim 22 limits the way the service data is made available to the user. Uniloc objects that Defendants' construction requires service data can only be made available by "transmitting" to the user. Doc. No. 141 at 17. Defendants seek to make clear that transmitting is just one way of making the service data available. Doc. No. 146 at 21-22. At the *Markman* Hearing, Defendants agreed to an alternative construction of "making service data available by any means, *including but not limited to*, transmitting the service data to the user" (emphasis added). Plaintiffs maintained their position that this term requires no construction, and disagreed with the alternative construction because it just adds more words in their view and is not helpful to the jury. The parties, however, agreed that this term could include many different ways of making the service data available to the user, e.g., service data stored on a

server or emailed directly to user, as long as user is able to download it, irrespective of whether the user actually downloads it. Therefore, the Court will adopt the plain meaning of the term supported by intrinsic evidence, as explained below.

Claim 22, which depends from system claim 15, recites as follows: "The system as in claim 15 wherein said remote service computer system *makes said service data available to said user* from said remote service system, *said user being able to download said service data* into said user computer system." '696 Patent Claim 22 (emphasis added). Furthermore, the specification describes three different embodiments for making the service data available to the user computer, one of which involves downloading the service data to the user computer, as recited in claim 22. *Id.* at 7:20-62. The specification states that once the service data is generated, the remote service computer system will make the service data available to the user computer system "in a number of ways." *Id.* at 7:20-25. According to the specification, the first two methods involve automatically or manually transmitting the data, while the third method, similar to claim 22, requires the user to download the service data into the user computer. *Id.* at 7:25-62.

Defendants acknowledge that "the transmission and reception of the service data may occur by any number of ways, including by downloading, uploading, automatic transmission, or manual transmission." Doc. No. 146 at 22. Claim 22, however, is explicitly limited to a system where the service data is made available to the user in a way that the user is able to download the service data into the user computer system. This is evident from the plain language of claim 22 and the relevant portion of the specification, as explained above. Though how the service data is made available is not limited, the language surrounding the claim term indicates that the user must be able to download the service data into the user computer system. Having resolved the disputes presented, no further construction is needed. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521

F.3d 1351, 1362 (Fed. Cir. 2008). Therefore, the Court construes **"makes said service data available"** to have its **plain meaning**.

## CONCLUSION

The Court hereby **ADOPTS** the above claim constructions for the '696 Patent. For ease of reference, the Court's claim interpretations are set forth in a table in Appendix A.

So ORDERED and SIGNED this 21st day of February, 2017.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

| Claim Term | Court's Construction |
|---|---|
| "predetermined" / "predetermined threshold" | a numerical based limit that is determined in advance |
| "attempt" | Plain meaning |
| "requiring" / "said software application requiring service data to activate at least part of the functionality of said software application" | Plain meaning |
| "makes said service data available" | Plain meaning |